### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **COURTNEY G. BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 4:23-CV-00212 PLC** |
| | ) | |
| **MARTIN O'MALLEY,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM AND ORDER

Plaintiff Courtney Brown seeks review of the decision of Defendant Social Security Commissioner Martin O'Malley denying her application for Disability Insurance Benefits (DIB) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

### I.     Background and Procedural History

On September 23, 2020, Plaintiff, who was born in February 1977, filed an application for DIB, alleging she was disabled as of May 21, 2020, as a result of migraines, fibromyalgia, bipolar disorder, generalized anxiety disorder, esophageal inflammation due to fibromyalgia, sinus tarsi syndrome, bilateral plantar calcaneal spurs. (Tr. 239-240, 267-274) The Social Security Administration (SSA) denied Plaintiff's claim. (Tr.  122-134) Plaintiff filed a request for reconsideration. (Tr. 135, 161) The SSA denied Plaintiff's claim on reconsideration and Plaintiff timely requested a hearing before an administrative law judge (ALJ).  (Tr. 10-12, 136-146, 172-

---

[1] Martin O'Malley became the Commission of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of 205(g) of the Social Security Act, 42 U.S.C. §405(g).

73)  The SSA granted Plaintiff's request for review and conducted a hearing on December 20, 2021.  (Tr. 52-87, 174-188)  On February 23, 2022, the ALJ issued a decision finding Plaintiff not disabled. (Tr.  18-37) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-7) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.    Evidence Before the ALJ

### A.  Plaintiff's Testimony

At the December 20, 2021 hearing, Plaintiff was 44 years old and lived with her husband and 9-year-old son. (Tr.  65-66) Plaintiff graduated from high school and last worked in December 2017 as a receptionist doing clerical work. (Tr.  68) Plaintiff experiences "debilitating" pain in her head, fingers, wrists, neck, upper shoulder blades, lower spine, hips, legs, left ankle, and from her shoulders to her elbows. (Tr.  67)

The majority of Plaintiff's head pain is located between her eyes in the "temple area" near her eyebrows where there is "consistent pressure 24/7." (Tr.  67) In addition, Plaintiff testified she gets 20 to 25 migraines per month, often in the morning, which leave her bedridden and unable to "do anything." (Tr.  72, 79)  Plaintiff takes sumatriptan and ketorolac when a migraine begins and sleeps until the migraine is gone. (Tr.  72) "[A] couple of years ago[,]" Plaintiff began receiving Botox injections approximately every three months.  (Tr.  72-73, 80) Since starting Botox, the duration of her migraines decreased from 8 to 10 hours previously to 1 to 4 hours presently.  (Tr. 72-73) Plaintiff's migraines are "unpredictable" "barriers[,]" in that Plaintiff does not "know when they're going to hit [her.]"  (Tr.  79)  Her migraines can be caused by "feeling pressure about

something," a "change," interaction with the public, concentrating, frustration, bright lights, and screens. (Tr. 79)

Plaintiff is able to lift 5 pounds, and stand and walk for 10 to 15 minutes. (Tr. 73-74) Plaintiff has difficulty bending, stooping, lifting, opening "the front door" and jars, and doing "anything that involves twisting." (Tr. 74) Plaintiff must sit to elevate and ice her left ankle after standing due to swelling, while walking causes "excruciating shooting pain" and swelling in her left ankle. (Tr. 73-74) Despite two surgeries on her left ankle, Plaintiff continues to wear a compression sock and must elevate her ankle "almost all day long." (Tr. 77)

The pain in her hands, wrists, and fingers "interferes" with her assisting her son with certain activities such as homework. (Tr. 67-68) Plaintiff testified she did "a lot of…typing, writing, [and] telephone" in her prior employment and the arthritis in her hands and wrists caused "problems with [her] hands." (Tr. 77) Plaintiff's husband sometimes assists her with dressing because she is unable to clasp her bra due to finger pain. (Tr. 77-78)

Plaintiff's medications include amitriptyline, buspirone, cephalexin, famotidine, folic acid, hydroxychloroquine, ketorolac, meclizine, meloxicam, methotrexate, methylprednisolone, ondansetron, pantoprazole, pregabalin, prochlorperazine, zolmitriptan, tizanidine, trazodone, vitamin D, and zolpidem. (Tr. 75, 352) Plaintiff's medications cause mental, physical, and emotional exhaustion. (Tr. 76) Plaintiff inability to function is "very depressing" and she gets anxiety "just trying to do these things and knowing that I can't." (Tr. 74) Plaintiff does not do any household chores and testified that her husband is her "24-hour caregiver[.]" (Tr. 74-76)

During a typical day, "after her migraine is over," Plaintiff gets up and makes something to eat. (Tr. 76) Plaintiff then sits "at the kitchen table for a few hours" not doing "much" because it "takes [her] a while to try to focus" before moving to the couch and elevating her ankle. (Tr. 76)

Plaintiff has a driver's license and drives approximately five minutes to pick up her prescriptions. (Tr.  66)  Plaintiff prefers not to drive for a long amount of time due to pain and fear that she is "not going to be able to, say, turn the corner." (Tr.  67)  Plaintiff has "major anxiety issues[, a] lot of [which] has to do with social interaction[.]" (Tr.  74) Plaintiff stated her anxiety "sometimes" makes her vomit and causes a "migraine within seconds." (Tr.  74) Plaintiff does not interact with anyone but her spouse and son, and no longer goes to the grocery store or church. (Tr.  75)

B. Function Reports

In an October 2020 function report, Plaintiff states she was "unable to complete tasks that take longer than 10 [minutes] due to [her] mental health [and] physical impairments." (Tr.  286) Plaintiff's daily activities include spending 30 to 60 minutes getting out of bed, eating breakfast, writing in her journal about "how I am feeling which is depressed [and] moody," sitting on the couch to relax, checking her appointments for the week, helping her son with virtual learning, and cooking and cleaning with help.  (Tr.  287)  Plaintiff is able to attend to her personal grooming, with the exception of clasping her bra because she is too "weak." (Tr.  287) Plaintiff needs reminders to take her medications. (Tr.  288)

Plaintiff, with her husband's help, cares for her child and their family dog. (Tr.  287) Plaintiff's husband does most of the cooking because Plaintiff is "too tired [and] weak[.]" (Tr. 287-88) Plaintiff prepares a meal once or twice a month, spending one to two hours each time. (Tr. 288) Plaintiff's husband completes all of the household chores. (Tr.  288)

Plaintiff takes "short walk[s]" outside. (Tr.  289) Plaintiff drives to appointments and to visit family. (Tr.  289) Plaintiff shops on her phone and in stores with help from her husband. (Tr. 289) She can count change and use a checkbook. (Tr.  289) Plaintiff's hobbies include writing, reading, watching television, coloring, and painting which she does while either sitting on the

4

couch or at the kitchen table. (Tr.  290) Plaintiff is "always tired" and "weak," and is unable to exercise due to her left ankle pain. (Tr.  290) Plaintiff's left ankle and fibromyalgia pain "is very crippling daily[,]" her mind is "very foggy," and her memory is not "as good as it used to be." (Tr. 290)

Plaintiff is able to lift 5 pounds and is unable to stand more than 10 minutes due to ankle instability. (Tr.  288,  291) Plaintiff can walk for "maybe a block or so[.]" (Tr.  291) Plaintiff is unable to lift, squat, bend, stand, and reach. (Tr.  291) Plaintiff's conditions affect her memory and concentration as well as her ability to walk, sit, kneel, climb stairs, complete tasks, understand, follow direction, and get along with others. (Tr.  291) Plaintiff is unable to follow spoken instructions and must look at written instructions "every few seconds[.]" (Tr.  291). Plaintiff does not get along with authority figures, stating "bosses are too bossy" and "strict." (Tr.  291) Plaintiff states she is "not a real sociable person anymore" but that she does text people. (Tr.  290) Stress causes Plaintiff "extreme anxiety" which makes her cry and she "gets angry, depressed, [and] migraines." (Tr.  292)

In a March 2021 function report, Plaintiff stated her typical day includes taking 30 to 60 minutes "to get out of bed[,]" eating, making "lots of calls because of all [the] financial stress," and trying to "sleep the rest of the day[.]" (Tr.  310) Plaintiff attends to her personal care, except "sometimes" her husband helps her clasp her bra. (Tr.  310)  She needs reminders to take her medication because her mind is foggy "24/7." (Tr.  311)

As she reported in the earlier function report, Plaintiff does not prepare any meals, relying on her husband to do all the cooking. (Tr.  311) Plaintiff dusts and puts the laundry in the washer but needs encouragement to do so. (Tr.  311) Plaintiff does not do any other household chores because "its labor [and her] body can barely function, stand [,]or walk too long[.]" (Tr.  311)

5

Plaintiff helps care for her child. (Tr.  310) Plaintiff can drive and goes outside "maybe once a week." (Tr.  312) Plaintiff shops on her phone and is able to pay her bills, count change, handle a savings account, and use a checkbook. (Tr.  312) Plaintiff has no hobbies or interests. (Tr.  313) Plaintiff does not engage in any social activity, stating she only goes to "appointments." (Tr.  313) Plaintiff has difficulty getting along with others and does not "associate" with people. (Tr.  313)

Plaintiff is able to lift 5 pounds and can walk a "few blocks" before needing to rest. (Tr. 314) Plaintiff is unable to squat due to knee pain, and bending, kneeling, and climbing stairs cause "a migraine." (Tr.  314) Plaintiff does not finish what she starts and cannot pay attention for "long." (Tr.  314) Plaintiff can follow written instructions with time but has difficulty comprehending spoken instructions. (Tr.  314) Plaintiff has a "short fuse" and does not handle stress well. (Tr. 315)

C.  <u>Vocational Expert's Testimony</u>

Vocational expert Delores Gonzalez also testified at the hearing. (Tr.  81) The ALJ asked Ms.  Gonzalez to consider a hypothetical individual with Plaintiff's age, education, and work experience who is able to perform light work with the following limitations:

> stand and walk for about six hours and sit for up to six hours in an eight-hour workday with normal breaks. This hypothetical individual can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. This hypothetical individual can occasionally balance, stoop, kneel, crouch and crawl. This hypothetical individual should avoid concentrated exposure to excessive noise, which is defined as any noise above noise level 3. This hypothetical individual should avoid concentrated exposure to excessive vibration. This hypothetical individual should avoid concentrated exposure to operation of controlled moving machinery. This hypothetical individual should avoid unprotected heights and exposure to hazardous machinery. This hypothetical individual's work is limited to simple and routine tasks. This hypothetical individual's work should be in a low stress job defined as having only occasional changes in the work setting. This hypothetical individual's work should not be in a fast paced type of job. This hypothetical individual should have no interaction with the public. And, this hypothetical individual should have only occasional interaction with coworkers and supervisors.

(Tr. 83-83)

Ms. Gonzalez concluded that such an individual could not perform Plaintiff's past work as actually performed by Plaintiff or as generally performed in the national economy but could perform other jobs such a photocopy machine operator, price marker, and housekeeping cleaner. (Tr. 83) The ALJ modified the hypothetical to include sedentary work with the previous postural and environmental limitations and the additional limitations of standing or walking for approximately two hours and sitting for up to six hours in an eight-hour workday with normal breaks. (Tr. 83-84) In response to the modified hypothetical, Ms. Gonzalez testified the individual would be able to perform the job of addresser, document preparer, and tube operator.  (Tr. 84) Ms. Gonzalez testified an employee can be off-task between zero and ten percent of the workday and maintain competitive employment. (Tr. 85) Employers "usually" tolerate 10 to 12 absences a year. (Tr. 85-86)

> ### D. Medical Records

In regard to Plaintiff's medical records, the Court adopts the facts that the Commissioner admitted and that Plaintiff set forth in her statement of material facts. [ECF Nos. 21, 25-1] The Court also adopts the additional facts contained in the Commissioner's response to Plaintiff's statement of material facts because Plaintiff did not contest them.[2]  [ECF Nos. 25-1]

## III.     Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

---

[2] Relevant medical records are discussed in detail below.

death or which has lasted or can be expected to last for a continuous period not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the ALJ engages in a five-step evaluation process.  See 20 C.F.R. § 404.1520(a).  Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must establish that he or she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(a), (c).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [the claimant's] ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).  At step three, the ALJ considers whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(a), (d). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d)

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); 20 C.F.R. § 404.1520(a), (e). RFC is "based on all relevant evidence including the medical records, observations of treating

8

physicians and others, and an individual's own description of his [or her] limitations." Id. (quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)).

At step four, the ALJ determines whether the claimant can return to his or her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. § 404.1520(a), (f); see McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, the claimant will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step.  McCoy, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R §§ 404.1520(a), (g); 404.1560 (c); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then he or she will be found to be disabled.  20 C.F.R. § 404.1520(g).

## IV.  ALJ's Decision

Applying the five-step evaluation process, the ALJ found Plaintiff: (1) had not engaged in substantial gainful activity since May 21, 2020, the alleged onset date; and (2) had the severe impairments of major depressive disorder, borderline personality disorder, attention deficit hyperactivity disorder, fibromyalgia, left ankle impingement syndrome, seronegative inflammatory arthritis, migraine headache, obesity, and mild sacroiliac joint arthrosis. (Tr. 20) The ALJ determined Plaintiff had the non-severe impairments of mild obstructive sleep apnea, vitamin D deficiency, and tiny subchondral cysts of various finger joints. (Tr. 20)  At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (Tr.  21)

The ALJ determined Plaintiff had the RFC to:

perform sedentary work as defined in 20 CFR 404.1567(a). [Plaintiff] can lift up to 10 pounds occasionally. She can stand/walk for about 2 hours and sit for up to 6 hours in an 8-hour workday, with normal breaks. She can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She should avoid concentrated exposure to excessive noise which is defined as any noise above noise level 3. She should avoid concentrated exposure to excessive vibration. She should void concentrated exposure to operational control of moving machinery. She should avoid unprotected heights and exposure to hazardous machinery. Her work is limited to simple and routine tasks. Her work should be in a low stress job, defined as having only occasional changes in the work setting. Her work should not be in a fast-paced type of job. She should have no interaction with the public. She should have only occasional interaction with coworkers and supervisors.

(Tr.  23)

In making this determination, the ALJ considered the medical evidence, the prior administrative findings, including the opinions of the State agency medical consultants, Plaintiff's testimony and self-reported activities of daily living, and other evidence of record, and concluded Plaintiff's medically determinable impairments limited her to sedentary work with the additional specified postural and environmental limitations. (Tr. 23-30) In considering Plaintiff's reported conditions and symptoms, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms but that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr.  25)   Specifically, the ALJ considered Plaintiff's medical records and found that the treatment notes and objective medical evidence did not corroborate Plaintiff's self-reported limitations and demonstrated Plaintiff's improvement with treatment. (Tr.  25-29) With respect to Plaintiff's migraine headaches, the ALJ concluded that the

medical records demonstrated Plaintiff's headaches "are sometimes severe" but did not corroborate Plaintiff's reports regarding the frequency, duration, and intensity of her headaches and that Plaintiff's alleged symptoms were "somewhat" inconsistent with treatment notes reflecting her improvement with treatment. (Tr.  26)

Based on the vocational expert's testimony, the ALJ found Plaintiff was unable to perform any past relevant work. (Tr.  30) However, based on the  RFC, Plaintiff's age, education, and prior work experience, and the vocational expert's testimony, the ALJ concluded Plaintiff was able to perform other jobs that existed in significant numbers in the national economy, such as addresser, document preparer, and tube operator. (Tr. 31)  The ALJ therefore determined Plaintiff was not disabled. (Tr.  32)

## V.    Discussion

Plaintiff argues the ALJ's decision is not supported by substantial evidence because the ALJ failed to fully and fairly develop the record by obtaining medical evidence that addressed Plaintiff's ability to function in the workplace and that supported the ALJ's RFC assessment during the entire period of disability. [ECF No. 20] Plaintiff also contends the ALJ's evaluation of Plaintiff's subjective complaints is not supported by substantial evidence because Plaintiff's testimony regarding the frequency, duration, and intensity of her migraine headaches was consistent with some of the medical evidence and the ALJ's decision fails to "understand that medical improvement is not necessarily consistent with a finding that the individual can" maintain full time work. [ECF No. 20]

The Commissioner counters that the ALJ was not required to seek additional medical opinions and could rely on the evidence contained in the record in determining Plaintiff's RFC. [ECF No. 25] The Commissioner further contends that substantive evidence supports the ALJ's

evaluation of Plaintiff's subjective complaints of symptoms, in that her complaints were inconsistent with treatment notes documenting Plaintiff's reported symptoms and improvement with treatment, and were not supported by the objective medical evidence and Plaintiff's activities of daily living. [ECF No. 25]

A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's determination, [but it] may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  Physical RFC

Plaintiff challenges the ALJ's determination of her physical RFC, asserting the decision is not supported by substantial evidence in the record.  RFC is the most a claimant can perform in a

work setting despite that claimant's physical or mental limitations. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. §416.945(a)(1). The ALJ determines a claimant's RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [his or her] limitations." Kraus v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (quoting Papesh v. Colvin, 786 F.3d 1126, 1131 (8th Cir. 2015)); 20 C.F.R. § 416.945(a)(1).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "An administrative law judge may not draw upon his own inferences from medical reports." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

1. Duty to Develop the Record

Plaintiff contends the ALJ erred by failing to obtain medical opinion evidence that addressed Plaintiff's ability to function in the workplace and that supported the ALJ's RFC assessment during the entire period of disability. [ECF No. 20] Plaintiff argues the most current medical opinion in the record, offered by State-agency consultant Daniel Gwartney, M.D., only considered medical evidence through February 2021 and that subsequent objective testing, and diagnosis and treatment by Plaintiff's treating rheumatologist, Mehwish Bilal, M.D., supported additional functional limitations. Specifically, Plaintiff contends that: (1) Dr. Bilal's April 2021 diagnosis and treatment of seronegative inflammatory arthritis and (2) June 2021 imaging

revealing "tiny subchondral cysts of various IP joints" in Plaintiff's hands, support a finding of limitations to Plaintiff's ability to finger and handle in the RFC. [3]  [ECF No. 20]  Plaintiff argues the ALJ was required to seek a medical expert's opinion to determine Plaintiff's RFC based on the record as a whole, including the new diagnosis of seronegative inflammatory arthritis, clinical findings, and x-rays results. [ECF No. 20]  In response, the Commissioner argues the ALJ was not required to seek additional medical opinions and that the ALJ could rely on the relevant evidence contained in the record in determining Plaintiff's RFC.

The ALJ "has a duty to fully and fairly develop the evidentiary record." Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012). In some cases, the duty to develop the record requires the ALJ to obtain medical evidence, such as a consultative examination of the claimant, before rendering a decision. See 20 C.F.R. §404.1519a(b). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." McCoy, 648 F.3d at 612. "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000)  (quoting Reeves v. Heckler, 734 F.2d 519, 522 n. 1 (11th Cir.1984)).

---

[3] Plaintiff also challenges Dr. Gwartney's assessment of Plaintiff's symptoms from fibromyalgia, noting that Dr. Gwartney observed that Plaintiff did not have "regular evaluation of trigger points." [ECF No. 20, citing Tr. 143]  Specifically, Plaintiff argues that the lack of trigger point evaluation "changed" on July 15, 2021, after Dr. Gwartney's review, when Dr. Bilal confirmed multiple fibromyalgia "trigger points." [ECF No. 20, citing Tr. 2049] Plaintiff's argument, however, is not supported by the record. Dr. Bilal's treatment notes, both before and after Dr. Gwartney's review, contain identical language with respect to any physical examinations, simply stating: "[m]ultiple tender points around the neck, shoulder, lower back, anterior chest wall, knees, lower back, no active synovitis appreciated." (Tr.  1044, 1130, 1443, 2059, 2087) Dr. Bilal's treatment notes never provided any information regarding her trigger point evaluation or elaborated on these general findings.  Simply stated, there was no difference in Dr. Bilal's fibromyalgia trigger point evaluation in the treatment notes after Dr. Gwartney's review, and Plaintiff's contention that a "change" in Dr. Bilal's findings supports reversal is unsupported by the record.

With respect to Plaintiff's physical impairments, the record contains the opinions of two State agency non-examining consultants, Donald Charles Nelson, M.D., and Dr. Gwartney, which were offered, respectively, at the SSA's initial review and denial of benefits and on the SSA's reconsideration of that decision. (Tr.  129-131, 141-143)  On December 31, 2020, Dr. Nelson issued his opinion that Plaintiff had the RFC to lift or carry 20 pounds occasionally and 10 pounds frequently,[4] and could stand or walk for 4 hours and sit for about 6 hours in an 8-hour workday, with additional postural and environmental limitations.  (Tr.  129-130)  Dr. Nelson found Plaintiff's allegation of disabling symptoms to be partially consistent with the medical evidence of record. (Tr.  131) In rendering his decision, Dr. Nelson considered Plaintiff's diagnosed medical conditions, her activities of daily living, and the medical treatment notes from February 28, 2019 through November 19, 2020. (Tr.  130-131)

On May 3, 2021, Dr. Gwartney issued his medical opinion also finding that Plaintiff had the ability to lift or carry 20 pounds occasionally and 10 pounds frequently, and could stand or walk for 4 hours and sit for about 6 hours in an 8-hour workday. (Tr.  141-142) Although Dr. Gwartney also found additional postural and environmental limitations, he included fewer limitations than Dr. Nelson.  (Tr.  141-142) Dr. Gwartney considered the medical records through February 2021 and found that Plaintiff's allegations of disabling symptoms were only partially consistent with the medical evidence. (Tr.  143) Specifically, Dr. Gwartney's opinion was based on treatment notes demonstrating Plaintiff had a "good response"  to the Botox treatments for her migraines, that she was receiving conservative treatment for bilateral plantar fasciitis and sinus

---

[4] This constitutes "light work" under the SSA regulations. 20 C.F.R. § 404.1567(b). Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and which "requires a good deal of walking or standing[.]" Id.

tarsi syndrome for her left ankle, and that Plaintiff's left ankle pain with impingement was "responding to corticosteroid injections." (Tr. 143)

In April 2021, Dr. Bilal, Plaintiff's treating rheumatologist, diagnosed Plaintiff with seronegative inflammatory arthritis and prescribed Plaquenil based on Plaintiff's reported joint pain and lab results showing "elevated C reactive protein[.]" (Tr. 1784-90) Dr. Bilal's July 2021 treatment notes reflect Plaintiff's diagnosis as "seronegative inflammatory arthritis likely psoriatic arthritis" with "moderate disease activity." (Tr. 2062) Dr. Bilal ordered x-rays of Plaintiff's hands, hip, and SI joints which revealed "tiny subchondral cysts of various [proximal interphalangeal or] PIP joints" which "can be seen as an early finding with erosive arthropathy." (Tr. 1960, 1963, 2062, 2089)

The ALJ concluded that the State-agency medical consultants' opinions that Plaintiff was capable of light work with additional postural and environmental limitations not persuasive because "they are inconsistent with the objective medical evidence, including additional medical records submitted after they were rendered." (Tr. 29) Specifically, the ALJ found the medical evidence demonstrated that Plaintiff was unable to stand or walk for six hours in an 8-hour workday, that Plaintiff's inflammatory arthritis and fibromyalgia required additional postural limitations, and that additional environmental limitations were necessary to "avoid triggering migraines and ensure her safety should a migraine occur." (Tr. 29)

Here, the ALJ had the opinions of two State agency non-examining consultants offered within the relevant time period. Although these consultants did not have the benefit of Dr. Bilal's April 2021 diagnosis of seronegative inflammatory arthritis and the July 2021 imaging when offering their opinions, the ALJ considered this medical evidence and other evidence in the record in making his decision and in determining Plaintiff's RFC. The ALJ found Plaintiff's seronegative

inflammatory arthritis was a severe impairment and that her subchondral cysts were a non-severe impairment, and considered these conditions in determining Plaintiff's RFC. (Tr. 20, 26) Specifically, in assessing Plaintiff's functional limitations and RFC, the ALJ considered not only Dr. Nelson's and Dr. Gwartney's opinions but also the medical records, including treatment notes and objective medical testing occurring subsequently the consultants' reviews, Plaintiff's testimony and self-reported activities of daily living, and other evidence of record. (Tr. 23-30)

Plaintiff contends the new diagnosis, supported by imaging and blood tests, along with Dr. Bilal's finding of "moderate disease activity" and additional treatment "should have changed Dr. Gwartney's opinion" and supported limitations in "Plaintiff's ability to finger and handle" in the RFC. [ECF No. 20] However, as Plaintiff recognizes in her brief, "her reported symptoms remained relatively unchanged after her diagnosis of seronegative inflammatory arthritis[.]" [ECF No. 20] Plaintiff's self-reported limitations on fingering and handling are not supported by Dr. Bilal's treatment notes. Dr. Bilal's treatment notes reflect that Plaintiff complained of diffuse pain "mostly located in the neck, shoulder plate, wrist, knees, ankle, and feet" and that she only experienced "[o]n and off…swelling of feet and the hands."[5] (Tr. 1041, 1440, 1784-85, 2056, 2083) None of Dr. Bilal's treatment notes document Plaintiff's alleged inability to finger or handle. Further, Plaintiff's alleged inability to finger and handle are inconsistent with Plaintiff's October

---

[5] Dr. Bilal's treatment records demonstrate a single complaint made with respect to Plaintiff's hands. In April 2021, almost two weeks after an appointment, Plaintiff sent Dr. Bilal a message through the provider's portal inquiring whether Plaintiff had "arthritis or rheumatoid arthritis" because she "[felt] like [her] wrists and fingers are arthritis" and lab results demonstrated that her inflammation had "worsened." (Tr. 1807-08) Dr. Bilal responded that the treatment plan was to "start of Plaquenil for possible seronegative rheumatoid arthritis." (Tr. 1808) Plaintiff subsequently requested that Dr. Bilal "write specific notations that [Plaintiff has] rheumatoid arthritis" in her medical records prior to Plaintiff ordering copies of her records and inquiring why her records did not document that she had an "autoimmune disease[.]" (Tr. 1842) Dr. Bilal responded that Plaintiff has "seronegative inflammatory arthritis. That can be either psoriatic arthritis or seronegative rheumatoid arthritis" and that the treatment "is pretty much the same." (Tr. 1842)

2020 function report in which she reported writing in her journal daily and that her hobbies included writing, coloring, and painting. (Tr.  290)

Given the evidence of Plaintiff's diagnoses and symptoms in the record, this is not a case in which a crucial issue was undeveloped and it therefore was not necessary for the ALJ to obtain additional medical opinions regarding Plaintiff's conditions.  Here, the ALJ properly considered Plaintiff's medical records, the medical opinion evidence, Plaintiff's testimony and self-reported activities of daily living, and the other evidence in the record in determining Plaintiff's RFC. Based on the foregoing, the Court finds substantial evidence in the record supported the ALJ's RFC determination.

2.  Evaluation of Plaintiff's Subjective Complaints

Plaintiff argues the ALJ's evaluation of her subjective complaints was not supported by substantial evidence. Specifically, Plaintiff contends that: (1) some medical evidence supports her reports regarding the severity and frequency of her migraines and (2) that the ALJ's finding that Plaintiff's reports regarding the frequency, duration, and intensity of her headaches was not corroborated by the medical records and was inconsistent with Plaintiff reported improvement with treatment, fails to "understand that medical improvement is not necessarily consistent with a finding that the individual can" maintain full time work. [ECF No. 20]  The Commissioner counters that the substantive evidence supports the ALJ's evaluation of Plaintiff's subjective complaints of symptoms, in that they were inconsistent with treatment notes documenting Plaintiff's reported symptoms and her improvement with treatment, and were not supported by the objective medical evidence and Plaintiff's activities of daily living. [ECF No. 25]

Social Security Rule 16-3p, effective March 28, 2016, sets forth factors relevant to the ALJ's evaluation of the intensity, persistence, and limiting effects of a claimant's symptoms and

18

the ALJ's "analysis of whether a claimant's subjective complaints are consistent with the medical evidence." SSR 16-3p, 2017 WL 5180304 (SSA. Oct. 2017); Noerper v. Saul, 964 F.3d 738, 745 (8th Cir. 2020); Lawrence v. Saul, 970 F.3d 989, 995 (8th Cir. 2020). If a claimant makes statements about the intensity, persistence, and limiting effect of her symptoms, SSR 16-3p requires the ALJ to determine whether the statements are consistent with the medical and other evidence of record. SSR 16-3p, 2017 WL 5180304, at *8; see also 20 C.F.R. § 404.1529(c)(3) (explaining how the SSA evaluates symptoms, including pain). While SSR 16-3p eliminates the use of the term "credibility" in examining a claimant's subjective complaints and clarifies that the Commissioner's review is an examination for the level of consistency between a claimant's subjective assertions and the balance of the record as a whole, SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied" under Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[6] Noerper, 964 F.3d 738, 745 n. 3 (8th Cir. 2020).

Here, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms but that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 25) Specifically, the ALJ considered Plaintiff's medical records and found that the treatment notes and objective medical evidence did not

---

[6] The SSR 16-3p factors are similar to the Polaski factors and include: (1) the claimant's daily activities; ( 2) the location, duration, frequency, and intensity; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) treatments other than medications; (6) other measures used to relieve symptoms; and (7) any other functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8.

SSR 16-3p also directs the ALJ to set forth specific reasons for the weight given to the claimant's symptoms and to identify and explain the consistencies and inconsistencies between the claimant's symptoms and the other evidence of record. 2016 WL 1119029, at *8-9. Furthermore, SSR 16-3p requires the ALJ to consider and discuss only those factors that are relevant to the assessment. 2016 WL 1119029, at *7. Compare Renstrom, 680 F.3d at 1066 (in evaluation of claimant's subjective complaints, the ALJ must consider all of the evidence and make an express determination, detailing her reasons for discounting the claimant's complaints, identifying inconsistencies between the claimant's complaints and the evidence in the record, and discussing the relevant factors set forth in Polaski, 739 F.2d 1320).

corroborate Plaintiff's self-reported limitations and demonstrated Plaintiff's improvement with treatment. (Tr.  25-29) With respect to Plaintiff's migraine headaches, the ALJ concluded that the medical records demonstrated Plaintiff's headaches "are sometimes severe" but did not corroborate Plaintiff's reports regarding the frequency, duration, and intensity of her headaches and that Plaintiff's alleged symptoms were "somewhat" inconsistent with treatment notes reflecting Plaintiff improvement with treatment. (Tr.  26) In support, the ALJ discussed the treatment notes from Seth Hepner, M.D.'s, Plaintiff's treating neurologist, including Plaintiff's reported improvement with treatment, in support of the ALJ's conclusion that the medical records did not support greater limitations than those in the RFC. (Tr.  26)

The ALJ's finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence, particularly with respect the frequency, duration, and intensity of her migraine headaches, is supported by substantial evidence. (Tr.  25) When Dr. Hepner began treating Plaintiff for migraines in February 2019, Plaintiff reported experiencing approximately 25 "headache days per month" with each headache lasting "multiple hours[.]" (Tr.  357) At that time, prophylactic medications were unhelpful in preventing Plaintiff's migraines but Imitrex "work[ed]" at relieving them.  (Tr.  357)

On March 15, 2019, Dr. Hepner began administering Botox injections as treatment, which were repeated every 12 weeks. (Tr.  989-991)  During a follow-up appointment a month later, Plaintiff reported having 12 headaches in March and 6 in April. (Tr.  366) Although Plaintiff's headaches were "still quite frequent," the severity of her migraines improved and they were less "debilitating." (Tr.  366) Plaintiff denied any side effects from the Botox, and stated that a combination of Toradol and Imitrex "works very well" in relieving her headaches. (Tr.  366) In June 2019, Plaintiff estimated that she was having approximately 12 headaches per month, which

was "greatly improved from prior to the initiation of Botox when she was having 20 headaches days per month." (Tr.  1075)

Dr.  Hepner's  treatment  notes  reflect  that  Plaintiff  sometimes  experienced  frequent migraines, including having setbacks  related to situational factors.[7] (Tr.  373, 398, 625, 989, 1708) However,  Plaintiff  consistently  reported  that  the  frequency,  intensity,  and  duration  of  her migraines  significantly  improved  with  Botox  and  that  her  "abortive"  medications,  including "headache cocktails" of a combination of several medications, relieved her migraines. (Tr.  366, 373, 381-82, 389, 398, 1075, 1834, 2075)  Plaintiff denied "any side effects or intolerances from her medication." (Tr.  1075)   Plaintiff stated she was "very happy with the [Botox] therapy."  (Tr. 389) Plaintiff also began taking Lyrica as a prophylaxis, which "does seem to help." (Tr.  381, 1075)  Further, Dr.  Hepner's  treatment notes reflect that on those occasions when Plaintiff was currently experiencing a migraine with a reported pain level of an 8 or 9 out of 10, Plaintiff refused a "headache cocktail" and Plaintiff's neurological exams were normal.[8] (Tr.  637, 2096)

Thus,  while  Plaintiff's  testimony  regarding  the  decrease  in  duration  of  migraines  is supported by the medical records, her testimony that she experiences "consistent…24/7" head pain, in addition to 20 to 25 migraines per month is not supported by the medical evidence. Dr. Hepner's treatment notes reflect that, while Plaintiff previously experienced up to 25 migraines per month, that the Botox treatments significantly improved not only the intensity and duration of Plaintiff's migraines but also their frequency. Plaintiff's assertion that she suffers from constant headache pain is not supported by any medical evidence.

---

[7] For example, Plaintiff reported increased migraines after the denial of her disability claims (Tr. 1106, 373), after medication changes for her other conditions (Tr.  1106, 1244, 1247), amid concerns about timely receiving her medications (Tr.  1383), and after suffering a head injury (Tr.  635, 1757).
[8] Despite her reportedly suffering from a migraine, Dr. Hepner documented that Plaintiff was alert and oriented, and had an intact memory and comprehension, normal attention and concentration, and fluent speech.  (Tr.  637, 2096)

The ALJ's evaluation of Plaintiff's subjective complaints is also supported by evidence related to Plaintiff's other conditions, specifically those related to her left ankle. Plaintiff testified she is able to stand and walk for 10 to 15 minutes and that she has to sit and elevate her leg almost all day due to swelling and pain in the left ankle. (Tr.  73-74, 76) The medical records demonstrate that Plaintiff underwent surgery in May 2021 to remove two lipomas from Plaintiff's left ankle that were a source of impingement. (Tr.  1889, 1926-30) In June 2021, Maria McFarland, DPM, noted that Plaintiff "relate[d] decreased pain" and had normal range of motion (Tr.  2029-2030) In July 2021, Plaintiff reported "significant improvement of [her] symptoms compared to prior to surgery," including decreased pain and swelling, and that she was "wearing regular shoes comfortably" and slowly returning to "normal activities." (Tr.  2069) At that time, Dr. McFarland observed normal range of motion and no edema. (Tr.  2069)  Dr. McFarland advised Plaintiff to expect "up and down" swelling and some "achiness" or pain for the next 6 to 12 months but that she could slowly return to her normal exercise routine. (Tr.  2069) The record does not demonstrate that Plaintiff sought additional treatment for her left ankle after July 2021. Thus, Plaintiff's testimony as to debilitating left ankle pain and reduced functional limitations is inconsistent with the medical records demonstrating that her left ankle condition significantly improved after her May 2021 surgery. Accordingly, the ALJ's finding that Plaintiff's subjective reports regarding her symptoms, including those related to the frequency, intensity, and duration of her migraines, were not entirely consistent with the medical evidence is supported by substantial evidence.

Here, the ALJ included limitations to Plaintiff's RFC to account for her migraines, including certain "environmental limitations consistent with seizure-type precautions to avoid triggering migraines and ensure her safety should a migraine occur." (Tr.  29)  The Court therefore

finds the ALJ properly considered the factors set forth in SSR 16-3p and <u>Polaski</u> and determined that the evidence in the record failed to support greater limitations than those included in the RFC.

**VI.     Conclusion**

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of March, 2024